IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

| | | |
|---|---|---|
| JABARI ZAKI CUMMINS, | § | DEC 0 7 2021 |
| | § | |
| Movant, | § | **TAMMY H. DOWNS, CLERK** |
| | § | By:_____ |
| v. | § | Crim No. 4:17-cr-00111-JM-9 |
| | § | **DEP CLERK** |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Respondent. | § | |

## MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND FIRST STEP ACT OF 2018

COMES Movant, JABARI ZAKI CUMMINS ("Cummins"), appearing *pro se,* and respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release. The unprecedented threat of COVID-19 poses extraordinary risks to Cummins' health. The virus thrives in densely packed populations, and the FCI is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Cummins. Cummins' diagnosed medical conditions make him especially vulnerable to the deadly risks of COVID-19. Allowing Cummins to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus.

# I. <u>JURISDICTION</u>

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

# II. <u>STATEMENT OF THE CASE</u>

## A.    <u>Procedural Background</u>

On May 5, 2017, a grand jury sitting in the United States District Court for the Eastern District of Arkansas, Central Division, returned a sixty-seven (67) count Indictment charging Cummins and thirty-three other co-defendants. See Doc. 3.[1] Count

---
[1]

"Doc." refers to the Docket Report in the United States District Court for the Eastern District of Arkansas, Central Division, in Criminal No. 4:17-cr-00111-JM-9, which is immediately followed by the Docket Entry Number.

1 charged Cummins with Conspiracy to Possess with Intent to Distribute Heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B). *Id.* Count 20 charged Cummins with Possession with Intent to Distribute at Least 100 Grams of Heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). *Id.* Count 21 charged Cummins with Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). *Id.* Count 22 charged Cummins with Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). *Id.* Count 44 charged Cummins with Use of Communication Facility to Facilitate a Drug Trafficking Crime, in violation of 21 U.S.C. § 843(b). *Id.*

On April 18, 2018, a Change of Plea Hearing was held and Cummins entered a plea of guilty to Count 1 of the Indictment, pursuant to a written Plea Agreement. See Docs. 514, 515.

On September 5, 2018, Cummins was sentenced to a term of 188 months' imprisonment, 5 years of Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $100. See Docs. 636, 637.

### B.   Statement of the Facts

####    1.   Offense Conduct

The government and Cummins, through the advise of his counsel, stipulated that

the following facts are true [Doc. 515 at 5-6]:

> In December 2015, FBI and the North Little Rock Police Department began investigating a drug-trafficking organization, distributing crack cocaine in the downtown North Little Rock area. Throughout the investigation, FBI identified several targets in both Little Rock and North Little Rock, and obtained several wiretaps, including wiretaps on telephones used by Aaron Laray Clark, aka "Black," the user of Target Phones 7 and 9. Analysis of Target Phones 7 and 9 revealed that Clark supplied the defendant, Jabari Cummins, with ounce quantities of heroin, which Cummins redistributed to others. For example, on September 25, 2016, in Call No. 637 at 11:30 a.m. on Target Phone 7, Clark called Cummins at (501) 257-7176. During the call, Cummins asked Clark to come see him and to bring a gun and heroin. Specifically, Cummins asked Clark to "do that again for me," and then said, "you know what I'm talking about?" Clark responded, "nah," and asked Cummins if he wanted him to, "put it back for you or bring you another one?" Cummins said, "nah, just do the same thing you gave me, think they were ten, wasn't it," meaning ten ounces of heroin. Later, on November 9, 2016, in Call No. 1417 at 8:12 p.m. on Target Phone 9, Cummins, using (501) 442-1050, called Clark to arrange a time to meet to get more drugs. During the call, Clark warned Cummins not to sell any drugs to "John," one of their heroin customers, because "John" had been arrested and may talk to the police. After agents positively identified Cummins from the wiretaps, agents learned that Cummins had been involved in a high-speed chase with Little Rock police officers on February 28, 2016. Cummins crashed the truck he was driving near a residence at 27 Dellwood Drive and fled the scene. Inside the truck, officers found 114.5273 grams of heroin, 16.2062 grams of fentanyl, and 23.9209 grams of cocaine. Cummins agrees that the amount of heroin attributable to him throughout the conspiracy period is at least 700 grams but less than 1 kilogram.

2.   <u>Plea Proceeding</u>

On April 18, 2018, a Change of Plea Hearing was held before Judge James M. Moody Jr. See Doc. 514. Cummins pled guilty to Count 1 of the Indictment, pursuant

to a written Plea Agreement. See Doc. 515. In Exchange for Cummins' guilty plea, the government agreed to move for dismissal of the remaining counts (Counts 20, 21, 22, and 44). *Id.* at 1.

### 3.   Sentencing Proceeding

On September 5, 2018, a Sentencing Hearing was held before Judge James M. Moody Jr. See Doc. 636. The Court sentenced Cummins to a term of 188 months on Count 1; followed by 5 years supervised release; and was ordered to pay a Mandatory Special Assessment Fee of $100. See Doc. 637. Counts 20, 21, 22, and 24 of the Indictment were dismissed on the motion of the government. *Id.* at 1. No direct appeal was filed in this case.

## III. **DISCUSSION**

As a preliminary matter, Cummins respectfully requests that the Court be mindful that *pro se* pleadings are construed liberally. See *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015); *Estelle v. Gamble*, 429 U.S. 97 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519 (1972) (same).

### A.   **Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence**

This Court has the power to adjust Cummins' sentence. District courts no longer

need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. §3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

1.    Historical Framework

Congress first enacted the compassionate release provisions in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. That legislation provided that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. §3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes an "extraordinary and compelling reason," but the legislative history recognized that the statute was intended, in part, to abolish and replace federal parole. Rather than have the parole board review for rehabilitation only, Congress authorized review for changed circumstances:

The Committee believes that there may be unusual cases in which an

6

eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term on imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. §3582 acts as a "safety valve" for the "modification of sentences" that would previously have been addressed through the former parole system. *Id.* at 121. The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id.* Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

2. <u>Section 3582(c)(1)(A) is Not Limited To Medical, Elderly or Childcare Circumstances</u>

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the United States Sentencing Commission. 28 U.S.C. § 994(t) ("The Commission...shall describe what should be considered "extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples." Congress provided one limitation to that authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could,

however, be considered with other reasons to justify a reduction.

In 2007, the Sentencing Commission defined "extraordinary and compelling reasons" as follows:

> (A)  Extraordinary and Compelling Reasons - Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the following circumstances:
>
>> (i)  The defendant is suffering from a terminal illness.
>> (ii)  The defendant is suffering from a permanent physical or medical condition, or is experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self care within the environment of a correctional facility and for which conventional treatment promises no substantial improvement.
>> (iii)  The death or incapacitation of the defendant's only family member capable of caring for the defendant's minor child or minor children.
>> (iv)  As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason for purposes of subdivision (1)(A). USSG §1B1.13, Application Note 1.

As we will see, with the passage of The First Step Act, subparagraph (iv) is no longer limited by what the BOP decides is extraordinary and compelling.

Historically, the BOP rarely filed motions under §3582(c)(1)(A), even when the inmates met the objective criteria for modification. See U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons Compassionate Release Program (Apr. 2013). The Office of the Inspector General also found that the BOP failed to

8

provide adequate guidance to staff on the criteria for compassionate release, failed to

set time lines for review of compassionate release requests, failed to create formal

procedures for informing prisoners about compassionate release, and failed to generate

a system for tracking compassionate release requests. *Id.* at i-iv.

Congress heard those complaints and in late 2018 enacted The First Step Act.

3.    The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among

other things, transformed the process for compassionate release. *Id.* at § 603. Now,

instead of depending upon the BOP to determine an inmate's eligibility for

extraordinary and compelling reasons and the filing of a motion by the BOP, a court

can resentence "upon motion of the defendant." A defendant can file an appropriate

motion if the he or she has exhausted all administrative remedies or "the lapse of 30

days from the receipt of such a request by the warden of the defendant's facility,

whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The purpose and effect of this

provision is to give federal courts the ability to hear and resentence a defendant even

in the absence of a BOP motion. Congress labeled this change "Increasing the Use and

Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018).

Senator Cardin noted in the record that the bill "expands compassionate release under

the Second Chance Act and expedites compassionate release applications." 164 Cong.

9

R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as … improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

### 4.   Cummins Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

On July 28, 2020, Cummins has filed a request for compassionate release to John P. Yates, FCI Forrest City warden. See Exhibit 1. Thirty (30) days have lapsed from the receipt of the request but up to this date, no response yet. Because 30 days have lapsed from the receipt of the request and the BOP failed to file a motion on Cummins' behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

### B. Cummins' Current Conditions of Confinement and Health Conditions

COVID-19 has infected hundreds of prisoners and staff in city jails, state prisons and federal prisons.

**Note:** Cummins, age 43, suffers from hypertension with hypertensive retinopathy. See Exhibit 2.

**Facts:**

***Hypertension***. Hypertension is another name for high blood pressure. It can lead to severe health complications and increase the risk of heart disease, stroke, and sometimes death.

Blood pressure is the force that a person's blood exerts against the walls of their blood vessels. This pressure depends on the resistance of the blood vessels and how hard the heart has to work.

Hypertension is a primary risk factor for cardiovascular disease, including stroke, heart attack, heart failure, and aneurysm. Keeping blood pressure under control is vital for preserving health and reducing the risk of these dangerous conditions.

***COVID-19***. COVID-19 is the disease caused by the new coronavirus that emerged in China in December 2019. COVID-19 symptoms include cough, fever or chills, shortness of breath or difficulty breathing, muscle or body aches, sore throat, new loss of taste or smell, diarrhea, headache, new fatigue, nausea or vomiting and congestion or runny nose. COVID-19 can be severe, and some cases have caused death.

New York, California and Ohio were among the first to release incarcerated people. Other states have followed, saying it is the only way to protect prisoners, correctional workers, their families and the broader community.

11

Jails and prisons often lack basic hygiene products, have minimal health care services and are overcrowded. Social distancing is nearly impossible except in solitary confinement, but that poses its own dangers to mental and physical health.

While there is absolutely no evidence to support that any person is more or less likely to be infected [with COVID-19] based on existing medical conditions, Cummins' argues that, first, prisoners experience exponentially higher rates of COVID-19 than the general population. As of June 2020, "[t]he COVID-19 case rate for prisoners was 5.5 times higher than the US population case rate."[2] Second, and more critically, older individuals and individuals with chronic medical conditions are at greater risk of hospitalization and death from COVID-19. For example, the CDC reports that persons aged 40 to 49 are 15 times more likely to be hospitalized and 130 times more likely to die from COVID-19 compared to persons aged 18 to 29 and younger.[3] In other words, Cummins does not only contend that his health conditions increase his risk of getting COVID-19; but also, he contends that those conditions greatly increase the risk that, if contracted, his COVID-19 infection would be severe or even deadly.

---

[2]

Brendan Saloner, *et al.*, *COVID-19 Cases and Deaths in Federal and State Prisons*, J. of the Am. Med. Ass'n (July 8, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768249.

[3]

*Hospitalizations & Death by Age*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last updated May 14, 2021).

*BOP Amid Covid-19*

One consequence of overcrowding is that prison officials have a difficult time providing adequate health care.

In 2011 the U.S. Supreme Court ruled that overcrowding undermined health care in California's prisons, causing avoidable deaths. The justices upheld a lower court's finding that this caused an "unconscionable degree of suffering" in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

Amid a worldwide pandemic, such conditions are treacherous. Some of the worst COVID-19 outbreaks in U.S. prisons and jails are in places – like Louisiana and Chicago – whose prison health systems have been ruled unconstitutionally inadequate. Criminologists and advocates say many more people should be released from jails and prison, even some convicted of violent crimes if they have underlying health conditions.

The decision to release prisoners cannot be made lightly. But arguments against it discount a reality recognized over two centuries ago: The health of prisoners and communities are inextricably linked. Coronavirus confirms that prison walls do not, in fact, separate the welfare of those on the inside from those on the outside.

### C.    **"Extraordinary and Compelling Reasons" Warrant a Reduction in Cummins' Sentence**

The principles of Compassionate Release allow for Cummins' early release. As

discussed above, the principles for release are no longer limited to BOP guidelines; federal courts have the power to determine what constitutes extraordinary and compelling circumstances.

      1.    COVID-19 Is a Public Health Disaster That Threatens Vulnerable Incarcerated Persons like Cummins.

As of November 22, 2021, has 134,198 federal inmates in BOP-managed institutions and 14,928 in community-based facilities. The BOP staff complement is approximately 36,000. There are 105 federal inmates and 259 BOP staff who have confirmed positive test results for COVID-19 nationwide. There have been 267 federal inmate deaths and 7 BOP staff member deaths attributed to COVID-19 disease. See https://www.bop.gov/coronavirus/ (last accessed November 22, 2021). Bottom line, Federal facilities are not immune.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons*. Clinical Infectious Diseases 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting

that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.

"The [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.10

Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the BOPs' prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus' impact will likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

2.  Cummins' Vulnerability to COVID-19 Due to His High Medical Risk Is an Extraordinary and Compelling Reason That Warrants a Sentence Reduction.

Cummins is particularly vulnerable to COVID-19 because of his Hypertension. At the time of sentencing, the Court could not have anticipated that Cummins' diseases

will place him in the "high risk" category nor the existence of the COVID-19. As the COVID-19 pandemic continues, it potentially poses a particular issue for older people and people with pre-existing medical conditions (such as serious heart condition, lung disease, and autoimmune disease) appear to be more vulnerable to becoming severely ill with the COVID-19 virus.

### Lung Problems, Including Asthma
COVID-19 targets the lungs, so you're more likely to develop severe symptoms if you have preexisting lung problems, such as: Moderate to severe asthma, Chronic obstructive pulmonary disease (COPD), Lung cancer, Cystic fibrosis, Pulmonary fibrosis. In addition to being an asthma trigger, smoking or vaping can harm your lungs and inhibit your immune system, which increases the risk of serious complications with COVID-19.

### Heart Disease, Diabetes and Obesity
People with diabetes, heart disease, high blood pressure or severe obesity are more likely to experience dangerous symptoms if infected with COVID-19. This may be of particular concern in the United States, which has seen increasing rates of obesity and diabetes over the years.
Obesity and diabetes both reduce the efficiency of a person's immune system. Diabetes increases the risk of infections in general. This risk can be reduced by keeping blood sugar levels controlled and continuing your diabetes medications and insulin. Your risk of serious illness may also be higher if you have heart diseases such as cardiomyopathy, pulmonary hypertension, congenital heart disease, heart failure or coronary artery disease.

### How SARS-COV-2 Causes Disease and Death in COVID-19
"You'd think underlying lung problems or immune system problems will be the greatest risk," says Dr. Levitt. "But it seems the biggest risk factors have been hypertension, diabetes and obesity." That has led many scientists to suspect that the profound inflammation seen in severe cases

of COVID-19 may be yet another problem linked to SARS-COV-2's fondness for ACE2. People with diabetes, hypertension and heart disease have more ACE2 on their cells as a response to the higher levels of inflammation that come with their condition; ACE2 has an anti-inflammatory effect. When SARS-COV-2 sticks to ACE2 and reduces its ability to do its job, the underlying inflammation gets worse.

When inflammation gets completely out of control the body enters what is called a cytokine storm. Such storms drive the most severe outcomes for COVID-19, including multi-organ failure. There is thus an obvious role for anti-inflammatory drugs. But knowing when to administer them is hard. Go too late, and the storm will be unstoppable; go too early, and you may dampen down an immune response that is turning the tide. A recent article in the Lancet suggests that it would help if COVID-19 patients were routinely screened for hyper-inflammation to help identify those who might benefit from anti-inflammatory drugs. But not everyone is convinced today's drugs have much to offer. "We tried [a range of anti-inflammatory treatment] and it actually didn't work," says Rajnish Jaiswal, who has been working on the front line of COVID-19 treatment at New York's Metropolitan Hospital.

https://www.economist.com/briefing/2020/06/06/how-sars-cov-2-causes-disease-and-death-in-covid-19.

### *Delta Plus Variant of COVID-19*

The latest coronavirus variant has spread to about a dozen countries—including India, the U.S., and the U.K.—while scientists scramble to figure out if the strain is more deadly or transmissible.

A new variant of the coronavirus has emerged, and scientists are working to figure out if it is more dangerous than its infamous cousin, the Delta variant, which has killed hundreds of thousands of people in India and is fast becoming the dominant variant around the world.

The state of Maharashtra, India, which was hit hard by the devastating second wave of COVID-19, has now reimposed lockdowns due to rising

17

fears about this new variant, dubbed Delta Plus (which is not an official designation).

Delta Plus differs just slightly from Delta—the predominant strain in India and the United Kingdom—which is more infectious and is thought to cause more hospitalizations than previous strains. Existing vaccines are effective against Delta, but only when people are fully vaccinated.

See https://www.nationalgeographic.com/science/article/how-dangerous-is-the-new-delta-plus- variant--heres-what-we-know.

The dangerous Delta variant of the coronavirus is spreading so quickly in the United States that it's likely the mutant strain will become predominant in the nation within weeks, according to federal health officials and a new analysis.

At a White House briefing on COVID-19 on Tuesday, Dr. Anthony Fauci of the National Institutes of Health said 20.6% of new cases in the U.S. are due to the Delta variant. And other scientists tracking the variant say it is on track to become the dominant virus variant in the U.S.

"The Delta variant is currently the greatest threat in the U.S. to our attempt to eliminate COVID-19," Fauci said. He noted that the proportion of infections being caused by the variant is doubling every two weeks.

The variant, first identified in India, is the most contagious yet and, among those not yet vaccinated, may trigger serious illness in more people than other variants do, he said.

See https://www.npr.org/sections/health-shots/2021/06/22/1008859705/delta-variant-coronavirus-unvaccinated-u-s-covid-surge.

Due to overcrowding, lack of resources, and little access to medical care, incarcerated people have been at high risk for contracting COVID-19. Now, as the highly transmissible Delta variant circulates widely, they may be even more susceptible

to the virus.

***Josh Manson***, a researcher at the UCLA Law COVID Behind Bars Data Project, tells Verywell that there have been few efforts to curb the Delta variant and COVID-19 overall, making prisons deadly places for transmission. "When the pandemic first hit in March 2020, prisons were not taking the situation seriously," Manson says. "We know that it's even more transmissible than it was the first time a year and a half ago. We've seen thousands of people die in jails and prisons."

So far, at least 2,718 people incarcerated in state and federal prisons, including ICE custody, have died of COVID-19, making prisons a lethal setting during the pandemic.[4]

According to Manson, the current death count is an underestimate. "There's evidence emerging that the counts that have been recorded are actually undercounted," Manson explains. "So we don't even know the true totals of how many people died."

### *For Prisoners, Vaccine Trial Participation May Do More Harm Than Good*

Early on, the Centers for Disease Control and Prevention (CDC) identified people in prison as vulnerable to COVID-19 infection. At the height of the pandemic, public health practitioners and civil rights organizations demanded the release of people

---

[4]

UCLA Law COVID Behind Bars Data Project. National aggregate counts. Updated July 6, 2021.

in prison due to overcrowding and the lack of access to medical care.[5]

According to the Prison Policy Initiative, the Federal Bureau of Prisons released over 24,000 people over the course of the pandemic, with sentences to be served in home confinement.[6]

While some prisoners were released, a portion of the releases were deathbed releases—or the release of incarcerated individuals who are near death.


*Delta Variant Is Creating a Web of Regional COVID-19 Epidemics*

"It's basically just taking the handcuffs off while they're [incarcerated people] on a ventilator and then saying, 'oh, you're free,' and then they die," Manson explains.

Deathbed releases have made it difficult to determine the number of deaths that occurred within prisons, Manson adds. In fact, the New York Times reported this week that dozens of these cases around the country have been excluded from official counts.

*Collecting COVID-19 Data From Prisons Remains Challenging*

Data collection within prisons has been no easy feat, according to Manson.

***Homer Venters, MD***, epidemiologist, clinical associate professor at New York

---

[5]

ACLU. ACLU demands the release from prisons and jails of communities vulnerable to COVID-19. Updated March 18, 2020.

[6]

Prison Policy Initiative. The most significant criminal justice policy changes from the COVID-19 pandemic. Updated May 18, 2021.

University's College of Global Public Health, and former chief medical officer for the New York City jail system, tells Verywell that to track and promote better health outcomes, he believes data should be collected by the CDC and state departments of health.

"Some of the recommendations that I really advocated for in the Biden Riley task force have explicitly called on the CDC and the state department's of health to become much more involved in tracking health outcomes," Venters says.

### Study: COVID-19 Crowdfunding Campaigns Benefited Privileged Groups Most

"All health data from prisons right now is really all over the place," Manson adds.

For example, prison systems report vaccination differently. Some prisons have reported the number of incarcerated people who have received only the first dose, while other systems have reported the number of staff and incarcerated people who received both doses.

### Vaccination Rates for Staff Lags Behind

Manson says that vaccine efforts within prisons aren't as robust as they should be. While 446,079 incarcerated individuals (or 66%) have received at least one dose

of the COVID-19 vaccine, carceral facility staff are vaccinated at much lower rates.4

Across all U.S. prisons, only 110,946 correctional staff (45%) have been vaccinated in comparison.[7] Venters says that low vaccination rates among carceral staff are a national problem.

"You'll see that the vaccination rate for incarcerated people is higher than for staff," Manson says. "That is not because incarcerated people have had easier access, but because staff refusal rates have been high." Because the Delta variant is highly transmissible, staff can serve as transmitters of the virus if they are unvaccinated.

"When you have such an overcrowded facility, which these facilities are right now, it only takes one case," Manson says. "So if a member is not vaccinated, they can very easily transmit the virus."

*Experts Say More Needs to Be Done to Curb Hesitancy*

According to Venters, the most basic strategies for curbing vaccine hesitancy—like addressing people's concerns about safety—are not being employed.

Incarcerated people have declined vaccinations because their questions about the vaccines were left unanswered, Venters says.

"Often behind bars, the way that the vaccine is offered is through these big mass

---

[7]

UCLA Law COVID Behind Bars Data Project. COVID-19 vaccines in carceral facilities. Updated 2021.

events, there's very little attention to finding the people who have questions, and really sitting down and talking to them," Venters adds.

### *Pfizer and Moderna COVID-19 Vaccines Could Produce Years of Immunity*

These questions typically arise for people in prison who have complicated health problems. "We have this paradoxical situation where some of the sickest people who really just had a lot of normal, genuine questions about vaccinations remain unvaccinated because of the way in which the vaccine has been offered," Venters stresses.

For correctional officers, some have rejected the vaccine because they were worried about not having enough paid time off, Venters notes.

"Correctional settings decided they were going to give people five or 10 days of COVID off, and that would include if they got sick from COVID, or if they had a side effect of the vaccine," he adds. "But many correctional officers blew through that time a year ago when they got sick."

### *WHO Urges Fully Vaccinated People to Wear Masks Due to Delta Variant Spread*

Correctional officers expressed worry to Venters that if they experienced side effects, they wouldn't have any sick time, underscoring the financial concerns for carceral staff and their families. This suggests a need for policy change within the

prison system, Venters says.

Regardless of a vaccine mandate, curbing the Delta variant will require engaging with carceral staff.

Hence, it is appropriate for Cummins to be released into an environment where he and his loved ones can control and direct his medical care. It is important for all of us to remember that convicted criminals are sent to prison as punishment—not for punishment. People who are severely debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a compelling social advantage to keeping them in prison.

**Note:**    According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.

a.    Based on what we know now, those at high-risk for severe illness from COVID-19 are:
- People 60 years and older
- People who live in a nursing home or long-term care facility

b.    People of all ages with underlying medical conditions, particularly if not well controlled, including:
- Cancer
- Chronic kidney disease
- Chronic lung diseases, including COPD (chronic obstructive pulmonary disease), asthma (moderate-to-severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension

24

- Dementia or other neurological conditions
- Diabetes (type 1 or type 2)
- Down syndrome
- Heart conditions (such as heart failure, coronary artery disease, cardiomyopathies or hypertension)
- HIV infection
- Immunocompromised state (weakened immune system)
- Liver disease
- Overweight and obesity
- Pregnancy
- Sickle cell disease or thalassemia
- Smoking, current or former
- Solid organ or blood stem cell transplant
- Stroke or cerebrovascular disease, which affects blood flow to the brain
- Substance use disorders

are the hallmark of those who are most endangered by the instant pandemic. These are "extraordinary and compelling reasons" for his release. See Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), see Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Cummins high susceptibility to COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an

extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like FCI to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Cummins suffers from ailments that have already been identified as "high risk," this Court should find that Cummins' legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible." And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests,

however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

Finally, in the last months, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. Approximately 1,700 inmates have been released from Los Angeles County Jails, and 1,000 inmates are to be released from New Jersey jails. Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

### 3. Courts Have Granted Compassionate Release in Light of the Instant Pandemic.

Courts around the country have granted compassionate release where the defendant suffers from a serious condition that increases the likelihood of severe consequences from COVID-19. See, e.g., *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Bess*, No. 16-cr-156,

27

2020 WL 1940809, at *8 (W.D.N.Y. Apr. 22, 2020) (congestive heart failure, coronary artery disease, diabetes, and hypertension); *United States v. Zukerman*, No. 16 Cr. 194 (AT), 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (diabetes, hypertension, and obesity); *United States v. Williams*, No. 3:04cr95/MCR, 2020 WL 1751545, at *3 (N.D. Fla. Apr. 1, 2020) (coronary disease, peripheral vascular disease, congestive heart failure, end-stage renal disease, hyperlipidemia, and prediabetes); *United States v. Watkins*, Case No. 15-20333 (E.D. Mich. Jul. 16, 2020), granting compassionate release to prisoner whose only underlying condition was previously-treated latent TB; and *Singh v. Barr*, No. 20-CV-02346-VKD, 2020 WL 1929366, at *10 (N.D. Cal. Apr. 20, 2020) (granting release from immigration custody for petitioner with latent TB, hypertension, and obesity); and *United States v. Gerard Scparta*, No. 18 Cr. 578 (AJN), ECF Dkt. 69 (S.D.N.Y. Apr. 19, 2020). In *Scparta*, Judge Nathan granted a compassionate release motion of a 55-year old defendant who suffers from high blood pressure, high cholesterol, sleep apnea, and hypertension. The court found that it could waive § 3582(c)(1)(A)'s 30-day waiting period and hear the motion, and describes USP Butner's "Kafkaesque" "14-day quarantine" process—which is neither a true "quarantine" nor actually limited to 14 days—before releasing inmates to home confinement.

4.     <u>Career Offender Enhancement</u>

28

In this case, Cummins' career offender enhancement is no longer valid due to a change of law– FSA of 2018. Due to this retroactive change of the law, his sentence now presents an error sufficiently grave to be deemed as a fundamental defect.

Cummins was over 18 years of age when he committed this offense, and it was a "controlled substance offense" within the meaning of U.S.S.G. § 4B1.1(a). His sentence was therefore subject to being enhanced under the "Career Offender" Guidelines provision, § 4B1.1, if he had "at least two prior felony convictions of either a controlled substance offense or a crime of violence. "The PSR construed U.S.S.G. § 4B1.2, which defines a "controlled substance offense" and a "crime of violence."

Cummins was sentenced as a career offender because before he was convicted in federal court of the present offense, Cummins has at least two prior felony convictions, enumerated as follows:

(1)   03/12/2002: Bank Robbery, Case NO. 4:02CR00171-1; and

(2)   09/07/2011: Possession of Cocaine with Intent to Deliver, Case No. CR 2011-3692. Cummins was sentenced to 5 years and served only 10 months.

Before the FSA, a 10-year mandatory minimum could be enhanced to 20 years if the defendant had one prior conviction for a felony drug offense. That definition encompassed felony possession of drugs. Two or more such prior offenses would result in a mandatory life sentence. After the FSA, enhancement under Section 851 requires

29

the defendant have a prior conviction for a serious drug felony or serious violent felony to enhance the 10-year mandatory minimum to a term of 15 years. Two or more such prior offenses result in a mandatory minimum of 25 years.

The terms "serious drug felony" and "serious violent felony" are defined in the statute. The serious drug felony definition comes from 18 U.S.C. Section 924(e)(2)(A) in the Armed Career Criminal Act. The definition requires that the prior offense have been punishable by at least 10 years of imprisonment and excludes mere possession felonies.


"Serious Drug Felony"An offense prohibited by 18 U.S.C. § 924(e)(2)(A) for which the defendant served a term of imprisonment of more than 12 months and was released from any term of imprisonment within 15 years of the instant offense.  Section 924(e)(2)(A) defines "serious drug felony" as an offense under the Controlled Substances Act (21 U.S.C. § 801 et seq.), the Controlled Substances Import and Export Act  (21 U.S.C. § 951 et seq.), Chap-ter 705 of Title 46 (Maritime Law Enforcement) or under state law, involving manufacturing, distribut-ing, or possessing with intent to distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802)), for which a maximum term of imprisonment is ten years or more.

30

Hence, if sentenced today, Cummins 2011 Possession of Cocaine with Intent to Deliver would no longer qualify as a predicate to enhance his sentence under the career offender guidelines as he only served 10 months as opposed to the "more than 12 months" required by the new law.

### 5.   Cummins' Remarkable Rehabilitation

**Note:** At sentencing, Cummins' received a three-level reduction for acceptance of responsibility. Also, he received a 28-months off of his sentence pursuant to Rule 35. Thus, he was sentenced to 180 months, which was reduced to 160 months pursuant to FSA 2018.

It is essential to also note that since Cummins' incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation." See Exhibit 3. Throughout the time he has spent in prison, Cummins has worked long and hard and diligently at his rehabilitation. Cummins' commitment to rehabilitation is found in his participation in educational opportunities while in prison. Cummins has taken several classes. Cummins has no incidents in over 12 months now and has been maintaining a clear conduct. Hence, there can be no genuine safety concerns on his release. His extraordinary rehabilitation shows that he is ready for re-entry.

Cummins urges the Court to consider the following case citations:

- *United States v. Carpenter*, 2:14-CR-00309-TLN, 2020 WL

31

5851129 (E.D. Cal. Sept. 30, 2020) in which the court initially denied the defendant's request for compassionate release but later granted on a motion for reconsideration after observing that cases within defendant's facility had increased and that the defendant was herself diagnosed with COVID-19.

- *United States v. Belanger*, 1:15-CR-00072-JDL, 2020 WL 5351028 (D. Me. Sept. 4, 2020), which granted release for a defendant at risk of severe COVID after he had served approximately 30% of a 132-month sentence.

- *United States v. Grant*, 16-30021-001, 2020 WL 4036382 (C.D. Ill. July 17, 2020) which specifically recognized that osteomyelitis may pose a serious health risk despite not being specifically named by the CDC as a COVID-19 risk factor.

- *United States v. Pabon*, 458 F. Supp. 3d 296, 299 (E.D. Pa. 2020) which granted defendant compassionate release after serving 14 months of a 46-month sentence because "continued incarceration might interfere with his ability to get needed medical care" for hypertension, diabetes, and other medical conditions.

And

- Section 1B1.13 has not been updated to reflect pursuant to the 2018 First Step Act, hence, defendants now have the ability to bring such motions directly. This anomaly has given rise to a debate concerning whether and to what extent § 1B1.13 applies to motions filed by defendants, with several circuits recently holding that § 1B1.13 applies only to motions filed by the Bureau of Prisons, and not to motions filed by defendants on their own behalf. See *United States v. McCoy*, Nos. 20-6821, 20-6869, 20-6875, 20-6877, 2020 WL 7050097, at *6-7 (4th Cir. Dec. 2, 2020); *United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *8-9 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020); *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020).

### D.   Recidivism Risk Level

Cummins has served almost 50% of his sentence. Factoring in Cummins' rehabilitation and clear conduct in prison, makes him substantially less likely to recidivate. Given the length of his imprisonment, his personal rehabilitation, and deeply felt remorse, the Court must conclude that deterrence and public protection are no longer strong § 3553(a) factors weighing in favor of continued detention.

Under 18 U.S.C. § 3582(c)(2), to modify Cummins' sentence, taking into account the advisory nature of the guidelines after *Booker* and the considerations set forth in 18 U.S.C. § 3553(a). The court should find that a sentence of time served is sufficient, but not greater than necessary, and accounts for the sentencing factors the court must consider pursuant to 18 U.S.C. § 3553(a), specifically deterrence, protection of the public, and respect for the law.

Here, although those factors fully support the substantial sentence originally imposed, in the current context of Cummins' medical condition and retroactive change of law– FSA 2018, Cummins' family believes compassionate release is appropriate at this time.

If granted compassionate release, Cummins will reside with his wife, Christina Cummins (and 6-yo child), who resides at 5301 BB Circle, Little Rock, AR 72206 – where he will be able to isolate himself and take the same precautionary measures that

all Americans are taking: frequent hand washing, sanitizing his living space, and seeking medical care as necessary. None of these precautions are available in prison. Further information about these release plans upon request.

Finally, Cummins have met all the requirements for compassionate release based on the combination of factors: health conditions, COVID-19 risk and the world's take on the global pandemic right now, retroactive change of law– FSA 2018 as well as length of time already served, good time credits he has served, post-sentencing rehabilitation, his BOP record does not show that he is violent or a threat to public safety, and the changing sentencing landscape justify granting compassionate release to Cummins.

## IV. CONCLUSION

For the above and foregoing reasons, Cummins prays this Court would consider his Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018, based upon the "extraordinary and compelling reasons" and release him to home confinement or hold a hearing as soon as possible.

Respectfully submitted,

Dated: November 30, 2021

JABARI ZAKI CUMMINS

34

REG. NO. 22777-009
FCI FORREST CITY MEDIUM
FEDERAL CORR. INSTITUTION
P.O. BOX 3000
FORREST CITY, AR  72336
Appearing *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on November _30_, 2021, a true and correct copy of the above and foregoing Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018 was sent via U. S. Mail, postage prepaid, Benecia Betton Moore, at U. S. Attorney's Office, Eastern District of Arkansas, P.O. Box 1229, Little Rock, AR 72203-1229.

JABARI ZAKI CUMMINS

**<u>EXHIBIT 1:</u>**
**"Administrative Remedies"**

BP-S148.055 **INMATE REQUEST TO STAFF** *CDFRM*     *Copy*
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO: (Name and Title of Staff Member) Warden John P. Yates | DATE: 7-28-2020 |
|---|---|
| FROM: Jahari Cummins | REGISTER NO.: 22777-009 |
| WORK ASSIGNMENT: A-2 Shower Orderly | UNIT: A-2 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.   Continue
on back, if necessary.   Your failure to be specific may result in no action being taken.   If
necessary, you will be interviewed in order to successfully respond to your request.)

3582(c)(1)(A) "Extraodinary and Compelling Circumstances"
I indicating that I should be able to receive a
reduction because (1) based on current law been change
FSA substived "serious drug felony" I was Career Offender of my
prior drug convictions were I was only given 5 yr. and I
actually served only 10 months. FSA the term "Serious drug
felony" is defined as an offense with a maxium penalty of at
least 10 yr. imrisoment for which the offender actually served
12 or more months. Do to me having High Blood Pressure it
Causes me to have mild hypertensive retinopathy in my left eye.
—7 over

(Do not write below this line)

DISPOSITION:

Signature Staff Member                     Date

Record Copy - File; Copy - Inmate          This form replaces BP-148.070 dated Oct 86
(This form may be replicated via WP)       and BP-S148.070 APR 94

Due to that I am wearing glasses now. Due to my high blood I am taking Hydrochlorothiazide 25mg tablets. (taking one tablet by mouth daily.) Also taking Amlodpine 10mg tablets. (taking one tablet by mouth daily.) Also due to me having COVID-19 when I was at F.C.I. Pollock back around May 7, 2020. Now I am what they calling a long hauler because I'm having bad headaches daily. Due to that I'm taking 325 mg of Acetaminophen three time a daily. And also taking 800 mg of Ibuprofen twice daily. I was told by Dr. when my pills run out to go too store to buy them. But the store doesn't sell 800 mg Ibuprofen so how am I to continue my current medication regimen. I feel that the Bureau of Prisons should be taking better care to make sure that the medications that I need are provided to me. Purchasing the medications from Commyssary is costly and unnecessary when I have been prescribed these medications already.

Should Compossionate Release be granted I have a place to reside which is at 5301 B-B CIR Little Rock Ar. 72206 were I will reside with my wife and child who is 6 yr. Her contact information to verify is 501-553-5554 Mrs. Chirtnia Cummins. I will also have stable employment availabe at Welspon Piping Company in Little Rock Ar. Where I will be a heavy machine operator. Where I have previously been employed and am up for rehiring. Upon release I will be able to get healthcare through my employer who will also help to provide me with the medications that I need. And to be able to also provide for my family and became a better functioning member of society.

# **EXHIBIT 2:**
## **"Medical Documents"**

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | |
|---|---|---|---|
| Inmate Name: | CUMMINS, JABARI ZAKI | | Reg #: 22777-009 |
| Date of Birth: | 03/23/1978 | Sex: M   Race: BLACK | Facility: POM |
| Encounter Date: | 09/03/2020 14:30 | Provider: Markey, J. MD | Unit: F01 |

Chronic Care - Chronic Care Clinic encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT  1        Provider:  Markey, J. MD

Chief Complaint:   Chronic Care Clinic

Subjective:   Mr. Cummins is a 42 year old gentleman seen for chronic care follow up. He takes HCTZ 25 mg and amlodipine 5 mg daily, and todays blood pressure is 118/78. He has been examined by Dr. Maxon, OD and found to have mild hypertensive retinopathy. Last labs taken 11/2019 showed normal renal function without proteinuria. Goal SBP <130. Continue HCTZ 25 mg daily, amlodipine 5 mg daily.

Pain:   Not Applicable

**Seen for clinic(s): Hypertension**

**OBJECTIVE:**

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 09/03/2020 | 14:28 POX | 98.0 | 36.7 | Oral | Sikes, Victoria CMA |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 09/03/2020 | 14:28 POX | 97 | Via Machine | Regular | Sikes, Victoria CMA |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 09/03/2020 | 14:28 POX | 19 | Sikes, Victoria CMA |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 09/03/2020 | 14:28 POX | 125/80 | Left Arm | Sitting | Adult-large | Sikes, Victoria CMA |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 09/03/2020 | 14:28 POX | 99 | Room Air | Sikes, Victoria CMA |

**Weight:**

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|---|---|---|---|---|---|
| 09/03/2020 | 14:28 POX | 193.0 | 87.5 | | Sikes, Victoria CMA |

**ROS Comments**

CONSTITUTIONAL: No weight loss, fever, chills, weakness or fatigue.
HEENT: Eyes: No visual loss, blurred vision, double vision or yellow sclerae.
ENT: No hearing loss, sneezing, congestion, runny nose or sore throat.
SKIN: No rash or itching.
CARDIOVASCULAR: No chest pain, chest pressure or chest discomfort. No palpitations or edema.
RESPIRATORY: No shortness of breath, cough or sputum.
GASTROINTESTINAL: No anorexia, nausea, vomiting or diarrhea. No abdominal pain or blood.
GENITOURINARY: No Burning on urination.
NEUROLOGICAL: No headache, dizziness, syncope, paralysis, ataxia, numbness or tingling in the extremities. No

| Inmate Name: | CUMMINS, JABARI ZAKI | | | | Reg #: | 22777-009 |
|---|---|---|---|---|---|---|
| Date of Birth: | 03/23/1978 | Sex: | M | Race: BLACK | Facility: | POM |
| Encounter Date: | 09/03/2020 14:30 | Provider: | Markey, J. MD | | Unit: | F01 |

change in bowel or bladder control.
MUSCULOSKELETAL: No muscle or back pain, joint pain or stiffness.
HEMATOLOGIC: No anemia, bleeding or bruising.
ENDOCRINOLOGIC: No reports of sweating, cold or heat intolerance. No polyuria or polydipsia.
ALLERGIES: No history of hives, eczema or rhinitis.

### Exam Comments

PATIENT AAOX3, NO ACUTE DISTRESS.
HEAD: NORMOCEPHALIC, ATRAUMATIC.
EYES: PERRLA, EOMI.
ENT: INTACTED TYMPANIC MEMBRANE BILATERALLY, NO BULGING OR EFFUSION.
PATENT NARES, NO CONGESTION OR DISCHARGED NOTED.
NECK: MIDLINE TRACHEA, FULL ROM, NO JVD, NO LYMPHADENOPATHY, NO THYROMEGALY, NO CAROTID
MURMURS OR BRUITS.
SKIN: NO RASH.
CARDIO: RRR, S1S2, NO MURMURS, RUBS, OR GALLOPS.
PULM: CTAB, NO CRACKLES, RONCHI OR WHEEZING.
ABD: SOFT, NT, ND, BS+, NO RIGIDITY, NO GUARDING.
UPPER EXT: FULL ROM, PALPABLE PULSES.
LOWER EXT:FULL ROM, PALPABLE PULSES. NO PITTING EDEMA BILAT.
NEURO: CN 2-12 GROSSLY INTACT, NO MOTOR DEFICIT, NO GAIT ABNORMALITIES.

### ASSESSMENT:

Essential (primary) hypertension, I10 - Current

Retinopathy, NOS, H3500 - Current

### PLAN:

### Renew Medication Orders:

| Rx# | Medication | | Order Date |
|---|---|---|---|
| 107860-CP1 | amLODIPine  5 MG TAB | | 09/03/2020 14:30 |
| | **Prescriber Order:** | Take one tablet (5 MG) by mouth each day x 180 day(s) | |
| | Indication:  Essential (primary) hypertension | | |
| 102954-CP1 | hydroCHLOROthiazide 25 MG Tab | | 09/03/2020 14:30 |
| | **Prescriber Order:** | Take one tablet (25 MG) by mouth each day x 180 day(s) | |
| | Indication:  Essential (primary) hypertension | | |

### Discontinued Non-Medication Orders:

| Order | Frequency | Duration | Details | Ordered By |
|---|---|---|---|---|
| Blood Pressure | Weekly | 14 days | starting 9/2 | Markey, J. MD |
| | Discontinue Reason: | No longer indicated | | |
| | Order Date: | 08/25/2020 | | |
| | End Date: | 09/09/2020 | | |

Schedule:

| Activity | Date Scheduled | Scheduled Provider |
|---|---|---|
| Clinical Encounter | 12/03/2020 00:00 | Physician 01 |

HTN with mild retinopathy stable on HCTZ 25 and amlodipine 5 mg

### Disposition:

Follow-up at Chronic Care Clinic as Needed

### Patient Education Topics:

| | | | | |
|---|---|---|---|---|
| Inmate Name: | CUMMINS, JABARI ZAKI | | Reg #: | 22777-009 |
| Date of Birth: | 03/23/1978 | Sex: M Race: BLACK | Facility: | POM |
| Encounter Date: | 09/03/2020 14:30 | Provider: Markey, J. MD | Unit: | F01 |

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 09/03/2020 | Counseling | Plan of Care | Markey, J. | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Markey, J. MD on 09/03/2020 19:02

# Bureau of Prisons
# Health Services
## Clinical Encounter - Administrative Note

| | | | | |
|---|---|---|---|---|
| Inmate Name: | CUMMINS, JABARI ZAKI | | Reg #: | 22777-009 |
| Date of Birth: | 03/23/1978 | Sex: M Race: BLACK | Facility: | POM |
| Note Date: | 09/03/2020 14:29 | Provider: Sikes, Victoria CMA | Unit: | F01 |

Admin Note - General Administrative Note encounter performed at Health Services.
**Administrative Notes:**

ADMINISTRATIVE NOTE **1** Provider: Sikes, Victoria CMA
Vitals for F/U.

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 09/03/2020 | 14:28 POX | 98.0 | 36.7 | Oral | Sikes, Victoria CMA |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 09/03/2020 | 14:28 POX | 97 | Via Machine | Regular | Sikes, Victoria CMA |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 09/03/2020 | 14:28 POX | 19 | Sikes, Victoria CMA |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 09/03/2020 | 14:28 POX | 125/80 | Left Arm | Sitting | Adult-large | Sikes, Victoria CMA |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 09/03/2020 | 14:28 POX | 99 | Room Air | Sikes, Victoria CMA |

**Weight:**

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|---|---|---|---|---|---|
| 09/03/2020 | 14:28 POX | 193.0 | 87.5 | | Sikes, Victoria CMA |

**Copay Required:** No          **Cosign Required:** No
**Telephone/Verbal Order:** No

Completed by Sikes, Victoria CMA on 09/03/2020 14:30

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | CUMMINS, JABARI ZAKI | | | Reg #: | 22777-009 |
| Date of Birth: | 03/23/1978 | Sex: | M   Race:  BLACK | Facility: | POM |
| Encounter Date: | 08/25/2020 17:45 | Provider: | Markey, J. MD | Unit: | F01 |

Chronic Care - Chronic Care Clinic encounter performed at Housing Unit.

**SUBJECTIVE:**

COMPLAINT  1          Provider:  Markey, J. MD

Chief Complaint:   Chronic Care Clinic

Subjective:   Mr. Cummins is a 42 year old gentleman seen for chronic care follow up. He was restarted recently on HCTZ 25 mg daily for which he reports daily compliance, after blood pressure evaluation was hypertensive. He has since been examined by Dr. Maxon, OD and found to have mild hypertensive retinopathy. Last labs taken 11/2019 showed normal renal function without proteinuria. Goal SBP <130. Continue HCTZ 25 mg daily, add amlodipine 5 mg daily. Follow up in the near future.

Pain:   Not Applicable

Seen for clinic(s): Hypertension

**OBJECTIVE:**

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 08/25/2020 | 17:45 POX | 98.0 | 36.7 | | Markey, J. MD |
| 08/10/2020 | 15:00 POX | 98.0 | 36.7 | | Markey, J. MD |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 08/25/2020 | 17:45 POX | 70 | | | Markey, J. MD |
| 08/10/2020 | 15:00 POX | 89 | | | Markey, J. MD |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 08/25/2020 | 17:45 POX | 18 | Markey, J. MD |
| 08/10/2020 | 15:00 POX | 18 | Markey, J. MD |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 08/25/2020 | 17:45 POX | 137/91 | | | | Markey, J. MD |
| 08/25/2020 | 11:44 POX hr 75 | 137/86 | Left Arm | Sitting | Adult-large | Boone, Glenda RN |
| 08/10/2020 | 15:00 POX | 140/93 | | | | Markey, J. MD |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 08/25/2020 | 17:45 POX | 98 | | Markey, J. MD |
| 08/10/2020 | 15:00 POX | 98 | | Markey, J. MD |

**ROS Comments**

CONSTITUTIONAL: No weight loss, fever, chills, weakness or fatigue.
HEENT: Eyes: No visual loss, blurred vision, double vision or yellow sclerae.

| Inmate Name: | CUMMINS, JABARI ZAKI | | | Reg #: | 22777-009 |
|---|---|---|---|---|---|
| Date of Birth: | 03/23/1978 | Sex: | M   Race:  BLACK | Facility: | POM |
| Encounter Date: | 08/25/2020 17:45 | Provider: | Markey, J. MD | Unit: | F01 |

ENT: No hearing loss, sneezing, congestion, runny nose or sore throat.
SKIN: No rash or itching.
CARDIOVASCULAR: No chest pain, chest pressure or chest discomfort. No palpitations or edema.
RESPIRATORY: No shortness of breath, cough or sputum.
GASTROINTESTINAL: No anorexia, nausea, vomiting or diarrhea. No abdominal pain or blood.
GENITOURINARY: No Burning on urination.
NEUROLOGICAL: No headache, dizziness, syncope, paralysis, ataxia, numbness or tingling in the extremities. No change in bowel or bladder control.
MUSCULOSKELETAL: No muscle or back pain, joint pain or stiffness.
HEMATOLOGIC: No anemia, bleeding or bruising.
ENDOCRINOLOGIC: No reports of sweating, cold or heat intolerance. No polyuria or polydipsia.
ALLERGIES: No history of hives, eczema or rhinitis.

**Exam Comments**

PATIENT AAOX3, NO ACUTE DISTRESS.
HEAD: NORMOCEPHALIC, ATRAUMATIC.
EYES: PERRLA, EOMI.
ENT: INTACTED TYMPANIC MEMBRANE BILATERALLY, NO BULGING OR EFFUSION.
PATENT NARES, NO CONGESTION OR DISCHARGED NOTED.
NECK: MIDLINE TRACHEA, FULL ROM, NO JVD, NO LYMPHADENOPATHY, NO THYROMEGALY, NO CAROTID MURMURS OR BRUITS.
SKIN: NO RASH.
CARDIO: RRR, S1S2, NO MURMURS, RUBS, OR GALLOPS.
PULM: CTAB, NO CRACKLES, RONCHI OR WHEEZING.
ABD: SOFT, NT, ND, BS+, NO RIGIDITY, NO GUARDING.
UPPER EXT: FULL ROM, PALPABLE PULSES.
LOWER EXT:FULL ROM, PALPABLE PULSES. NO PITTING EDEMA BILAT.
NEURO: CN 2-12 GROSSLY INTACT, NO MOTOR DEFICIT, NO GAIT ABNORMALITIES.

## ASSESSMENT:

Essential (primary) hypertension, I10 - Current

Retinopathy, NOS, H3500 - Current

## PLAN:

**New Medication Orders:**

| Rx# | Medication | Order Date |
|---|---|---|
| | amLODIPine Tablet | 08/25/2020 17:45 |
| | **Prescriber Order:**   5 mg Orally  -  daily x 90 day(s) | |
| | Indication:  Essential (primary) hypertension | |

**New Non-Medication Orders:**

| Order | Frequency | Duration | Details | Ordered By |
|---|---|---|---|---|
| Blood Pressure | Weekly | 14 days | starting 9/2 | Markey, J. MD |
| | Order Date: | 08/25/2020 | | |

Schedule:

| Activity | Date Scheduled | Scheduled Provider |
|---|---|---|
| Clinical Encounter | 09/16/2020 00:00 | Physician 01 |

HTN with mild retinopathy on hctz 25 last bp 137/91 on HCTZ 25 mg, amlodipine 5 mg was added

**Disposition:**

Follow-up at Chronic Care Clinic as Needed

| Inmate Name: | CUMMINS, JABARI ZAKI | | | Reg #: | 22777-009 |
| Date of Birth: | 03/23/1978 | Sex: | M   Race:  BLACK | Facility: | POM |
| Encounter Date: | 08/25/2020 17:45 | Provider: | Markey, J. MD | Unit: | F01 |

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 08/26/2020 | Counseling | Plan of Care | Markey, J. | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** No

**Telephone/Verbal Order:**   No

Completed by Markey, J. MD on 08/26/2020 07:46

# Bureau of Prisons
# Health Services
# Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | CUMMINS, JABARI ZAKI | | | Reg #: | 22777-009 |
| Date of Birth: | 03/23/1978 | Sex: | M      Race: BLACK | Facility: | POM |
| Note Date: | 08/20/2020 17:05 | Provider: | Markey, J. MD | Unit: | F01 |

Cosign Note - Clinical Encounter Cosign encounter performed at Health Services.
**Administrative Notes:**

    ADMINISTRATIVE NOTE   **1**          Provider:   Markey, J. MD
        plan for HTN follow up in near future

**ASSESSMENTS:**

Retinopathy, NOS, H3500 - Current

Schedule:

| Activity | Date Scheduled | Scheduled Provider |
|---|---|---|
| Clinical Encounter | 08/21/2020 00:00 | Physician 01 |

    HTN with mild retinopathy on hctz 25 last bp 140/93

**Copay Required:** No          **Cosign Required:**  No
**Telephone/Verbal Order:**  No

Completed by Markey, J. MD on 08/20/2020 17:07

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | CUMMINS, JABARI ZAKI | | | | Reg #: | 22777-009 |
| Date of Birth: | 03/23/1978 | Sex: | M   Race: BLACK | | Facility: | POM |
| Encounter Date: | 08/20/2020 11:56 | Provider: | Maxon, T. OD | | Unit: | F01 |

Optometry - Optometry Exam encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT  1        Provider:  Maxon, T. OD

Chief Complaint:   Eyes/Vision Problems
Subjective:   42 yo BM (+) HTN w/ h/o keratoconus, OS
Pain:      Not Applicable

**Vision Screen on 08/20/2020 11:56**

**Blindness:**

| | | | |
|---|---|---|---|
| Distance Vision: | Right Eye: 20/20 | Left Eye: 20/80 | Both Eyes: 20/20 |
| Near Vision: | Right Eye: | Left Eye: | Both Eyes: |

**With Corrective Lenses**

| | | | |
|---|---|---|---|
| Distance Vision: | Right Eye: 20/20 | Left Eye: 20/50 | Both Eyes: 20/20 |
| Near Vision: | Right Eye: | Left Eye: | Both Eyes: |

**Present Glasses - Distance**

| | Sphere | Cylinder | Axis | Add |
|---|---|---|---|---|
| R: | | | | |
| L: | | | | |

**Refraction - Distance**

| | Sphere | Cylinder | Axis | Add |
|---|---|---|---|---|
| R: | 0.00 | -0.75 | 36 | |
| L: | 0.00 | -4.00 | 155 | |

**Color Test:**

**Tonometry:**  L:  15      R:  15

**Comments:**

**OBJECTIVE:**

**Exam:**

**Eyes**

**General**
Yes: PERRLA, Extraocular Movements Intact

**Slit Lamp**
Yes: Normal Exam

**Periorbital/Orbital/Lids**
Yes: Normal Appearing

**Eyebrows**
Yes: Normal Appearing

**Conjunctiva and Sclera**
Yes: Within Normal Limits

**Cornea and Lens**
Yes: Normal Appearing

**Fundus Exam**
Yes: Hemorrhage-Intraretinal R

| Inmate Name: | CUMMINS, JABARI ZAKI | | | | Reg #: | 22777-009 |
| Date of Birth: | 03/23/1978 | Sex: | M | Race: BLACK | Facility: | POM |
| Encounter Date: | 08/20/2020 11:56 | Provider: | Maxon, T. OD | | Unit: | F01 |

### Exam Comments

Fundus photo/OCT done

**ASSESSMENT:**

Essential (primary) hypertension, I10 – Current

**PLAN:**

**Disposition:**

Follow-up at Sick Call as Needed
Return Immediately if Condition Worsens

**Other:**

1. Keratoconus, OS
- Continue w/ current specs

2. HTN w/ mild retinopathy
- Single intraretinal heme near macula of the right eye
- Monitor BP
- RTC 3-4 months for f/u

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 08/20/2020 | Counseling | Access to Care | Maxon, T. | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** Yes
**Telephone/Verbal Order:** No

Completed by Maxon, T. OD on 08/20/2020 11:59
Requested to be cosigned by Markey, J. MD.

Cosign documentation will be displayed on the following page.

# Bureau of Prisons
# Health Services
# Cosign/Review

| Inmate Name: | CUMMINS, JABARI ZAKI | | | Reg #: | 22777-009 |
|---|---|---|---|---|---|
| Date of Birth: | 03/23/1978 | Sex: | M | Race: | BLACK |
| Encounter Date: | 08/20/2020 11:56 | Provider: | Maxon, T. OD | Facility: | POM |

**Cosigned with New Encounter Note by Markey, J. MD on 08/20/2020 17:05.**

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | CUMMINS, JABARI ZAKI | | | Reg #: | 22777-009 |
| Date of Birth: | 03/23/1978 | Sex: | M   Race: BLACK | Facility: | POM |
| Encounter Date: | 08/10/2020 15:00 | Provider: | Markey, J. MD | Unit: | F01 |

Chronic Care - Chronic Care Clinic encounter performed at Housing Unit.

## SUBJECTIVE:

COMPLAINT   1          Provider:   Markey, J. MD

Chief Complaint:   Chronic Care Clinic

Subjective:   Mr. Cummins is a 42 year old gentleman who requests evaluation. BP 140/93. He was seen previously 2/2020 and was normotensive without antihypertensive therapy. He reports that he has gained some weight and reports frequent headaches and blurred vision and is anxious without antihypertensive medication. Restart HCTZ.

Pain:   Not Applicable

**Seen for clinic(s):** Hypertension

**Added to clinic(s):** Hypertension

## OBJECTIVE:
**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 08/10/2020 | 15:00 POX | 98.0 | 36.7 | | Markey, J. MD |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 08/10/2020 | 15:00 POX | 89 | | | Markey, J. MD |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 08/10/2020 | 15:00 POX | 18 | Markey, J. MD |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 08/10/2020 | 15:00 POX | 140/93 | | | | Markey, J. MD |

**SaO2:**

| Date | Time | Value(%) Air | | Provider |
|---|---|---|---|---|
| 08/10/2020 | 15:00 POX | 98 | | Markey, J. MD |

## ROS Comments

CONSTITUTIONAL: No weight loss, fever, chills, weakness or fatigue.
HEENT: Eyes: No visual loss, blurred vision, double vision or yellow sclerae.
ENT: No hearing loss, sneezing, congestion, runny nose or sore throat.
SKIN: No rash or itching.
CARDIOVASCULAR: No chest pain, chest pressure or chest discomfort. No palpitations or edema.
RESPIRATORY: No shortness of breath, cough or sputum.
GASTROINTESTINAL: No anorexia, nausea, vomiting or diarrhea. No abdominal pain or blood.
GENITOURINARY: No Burning on urination.
NEUROLOGICAL:+ headache, no dizziness, syncope, paralysis, ataxia, numbness or tingling in the extremities. No change in bowel or bladder control.
MUSCULOSKELETAL: No muscle or back pain, joint pain or stiffness.
HEMATOLOGIC: No anemia, bleeding or bruising.
ENDOCRINOLOGIC: No reports of sweating, cold or heat intolerance. No polyuria or polydipsia.

| Inmate Name: | CUMMINS, JABARI ZAKI | | | | Reg #: | 22777-009 |
|---|---|---|---|---|---|---|
| Date of Birth: | 03/23/1978 | Sex: | M | Race: BLACK | Facility: | POM |
| Encounter Date: | 08/10/2020 15:00 | Provider: | Markey, J. MD | | Unit: | F01 |

ALLERGIES: No history of hives, eczema or rhinitis.

### Exam Comments

PATIENT AAOX3, NO ACUTE DISTRESS.
HEAD: NORMOCEPHALIC, ATRAUMATIC.
EYES: PERRLA, EOMI.
ENT: INTACTED TYMPANIC MEMBRANE BILATERALLY, NO BULGING OR EFFUSION.
PATENT NARES, NO CONGESTION OR DISCHARGED NOTED.
NECK: MIDLINE TRACHEA, FULL ROM, NO JVD, NO LYMPHADENOPATHY, NO THYROMEGALY, NO CAROTID
MURMURS OR BRUITS.
SKIN: NO RASH.
CARDIO: RRR, S1S2, NO MURMURS, RUBS, OR GALLOPS.
PULM: CTAB, NO CRACKLES, RONCHI OR WHEEZING.
ABD: SOFT, NT, ND, BS+, NO RIGIDITY, NO GUARDING.
UPPER EXT: FULL ROM, PALPABLE PULSES.
LOWER EXT:FULL ROM, PALPABLE PULSES. NO PITTING EDEMA BILAT.
NEURO: CN 2-12 GROSSLY INTACT, NO MOTOR DEFICIT, NO GAIT ABNORMALITIES.

### ASSESSMENT:

Essential (primary) hypertension, I10 - Current

### PLAN:

### New Medication Orders:

| Rx# | Medication | | Order Date |
|---|---|---|---|
| | hydroCHLOROthiazide Tablet/Capsule | | 08/10/2020 15:00 |
| | **Prescriber Order:** | 25 mg Orally - daily x 180 day(s) | |
| | Indication: | Essential (primary) hypertension | |

### New Non-Medication Orders:

| Order | Frequency | Duration | Details | Ordered By |
|---|---|---|---|---|
| Blood Pressure | One Time | | 8/25/2020 | Markey, J. MD |
| | Order Date: | 08/10/2020 | | |

Schedule:

| Activity | Date Scheduled | Scheduled Provider |
|---|---|---|
| Clinical Encounter | 09/07/2020 00:00 | Physician 01 |
| review flow sheet BP check | | |

### Disposition:

Follow-up at Chronic Care Clinic as Needed

### Patient Education Topics:

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 08/11/2020 | Counseling | Plan of Care | Markey, J. | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Markey, J. MD on 08/11/2020 07:00

## **EXHIBIT 3:**

- **Inmate Education Data Transcript**
- **Sentence Monitoring Computation Data**
- **Certificates of Achievements**
- **Letters in Support of Cummins' Compassionate Release**

```
   FOM48          *          INMATE EDUCATION DATA       *      09-01-2021
   PAGE 001       *               TRANSCRIPT             *      12:32:54

REGISTER NO: 22777-009     NAME..: CUMMINS                     FUNC: PRT
FORMAT.....: TRANSCRIPT     RSP OF: FOM-FORREST CITY MED FCI
```

```
-------------------------- EDUCATION INFORMATION --------------------------
FACL ASSIGNMENT DESCRIPTION              START DATE/TIME STOP DATE/TIME
FOM  ESL HAS   ENGLISH PROFICIENT        06-13-2003 1645 CURRENT
FOM  GED EN    ENROLL GED NON-PROMOTABLE 06-13-2003 1645 CURRENT
FOM  GED SAT   GED PROGRESS SATISFACTORY 10-01-2019 1435 CURRENT
```

```
-------------------------- EDUCATION COURSES --------------------------
SUB-FACL   DESCRIPTION               START DATE  STOP DATE EVNT AC LV  HRS
FOM        21ST CENTURY EMPLOYABILITY 06-23-2021 07-23-2021  P  C  P     4
POM        PREGED 2B 9:00-10:30 M-F   02-25-2020 05-04-2021  P  W  I     0
POM        CHOLESTEROL                10-08-2020 10-22-2020  P  C  P     4
POL        GED CLASSROOM 3 1230-1400  09-19-2019 02-07-2020  P  W  I   270
POL        PLAYING GUITAR LIKE A PRO G.C. 11-05-2019 12-05-2019 P W P  18
POL        GED CLASSROOM 3 1400-1530  09-17-2019 09-19-2019  C  W  I     0
POL        AM PGED 1 B 10-1130 A.M.   03-18-2019 09-17-2019  C  W  I     0
POL        STRESS AND YOUR BODY 1 RPP1 06-02-2019 06-23-2019 P  C  P    12
POL        NUTRITION FITNESS MYTHS RPP1 06-05-2019 06-19-2019 P C  P     3
YAM        GED 1,M-F,800-1000         12-31-2008 05-29-2009  P  W  I   149
YAM        RPP5 RELEASE REQUIREMENTS  03-24-2009 03-25-2009  P  C  P     1
YAM        RPP4 CCC/USPO/AUSA SEMINAR 03-24-2009 03-25-2009  P  C  P     1
YAM        RPP2 DRESS FOR SUCCESS     03-24-2009 03-25-2009  P  C  P     1
YAM        RPP6 COPING W/PRISON STRESS 03-25-2009 03-25-2009 P  C  P     1
YAM        BUSINESS PLANNING 2        02-12-2009 03-05-2009  P  W  V     4
YAM        RPP1 NONRESID DRUG ABUSE TREAT 02-02-2009 03-02-2009 P C P    9
YAM        RPP1 DRUG EDUCATION        02-02-2009 02-02-2009  P  C  P    27
YAM        RPP1 RELAPSE PREVENTION    01-05-2009 02-09-2009  P  W  V     3
YAM        RPP1 INFECTIOUS DISEASE AWARE 12-11-2008 12-11-2008 P C P     1
FOR        GED 3:45-5:15 PM M-F       09-20-2005 04-03-2006  P  W  I   316
FOR        GED 12:30-2PM M-F          10-25-2004 08-29-2005  C  W  I     0
FOR        GED 10:30-12 FCI M-F       07-06-2004 10-25-2004  C  W  I     0
FOR        GED 1-3 FCI M-F            12-09-2003 07-06-2004  C  W  I     0
FOR        PRE GED 1-3 FCI M-F        09-30-2003 12-09-2003  C  C  P     0
```

```
-------------------------- HIGH TEST SCORES --------------------------
TEST       SUBTEST        SCORE     TEST DATE     TEST FACL  FORM    STATE
ABLE       LANGUAGE        6.7      08-12-2003    FOR
           NUMBER OPR      6.0      08-12-2003    FOR
           PROB SOLV       5.9      08-12-2003    FOR
           READ COMP       7.7      08-12-2003    FOR
           SPELLING        5.4      08-12-2003    FOR
           VOCABULARY      7.7      08-12-2003    FOR
GED        AVERAGE       440.0      08-30-2005    FOR        FAIL    AR
           LIT/ARTS      490.0      08-30-2005    FOR        IC      AR
           MATH          390.0      08-30-2005    FOR        IC      AR
           SCIENCE       430.0      08-30-2005    FOR        IC      AR
           SOC STUDY     430.0      08-30-2005    FOR        IC      AR
           WRITING       460.0      08-30-2005    FOR        IC      AR
```

```
G0002      MORE PAGES TO FOLLOW . . .
```

```
FOM48           *           INMATE EDUCATION DATA        *        09-01-2021
PAGE 002 OF 002 *                  TRANSCRIPT            *        12:32:54

REGISTER NO: 22777-009    NAME..: CUMMINS              FUNC: PRT
FORMAT.....: TRANSCRIPT    RSP OF: FOM-FORREST CITY MED FCI

---------------------------- HIGH TEST SCORES ----------------------------
TEST          SUBTEST       SCORE     TEST DATE      TEST FACL    FORM      STATE
GED PRAC      AVERAGE       46.8      08-10-2005     FOR          FAIL
              LIT/ARTS      49.0      08-23-2005     FOR          PB
              MATH          430.0     02-26-2009     YAM          PB
              SCIENCE       48.0      08-23-2005     FOR          PB
              SOC STUDY     51.0      08-23-2005     FOR          PB
              WRITING       49.0      08-23-2005     FOR          PB




G0000       TRANSACTION SUCCESSFULLY COMPLETED
```

```
   FOM48  540*23 *          SENTENCE MONITORING          *      09-01-2021
PAGE 001         *            COMPUTATION DATA           *      12:30:38
                            AS OF 09-01-2021
```

REGNO..: 22777-009 NAME: CUMMINS, JABARI ZAKI


```
FBI NO...........: 981849RA6         DATE OF BIRTH: 03-23-1978  AGE:  43
ARS1.............: FOM/A-DES
UNIT.............: UNIT A-2             QUARTERS.....: A02-207L
DETAINERS........: NO                  NOTIFICATIONS: NO
```

HOME DETENTION ELIGIBILITY DATE: 09-27-2028

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  03-27-2029 VIA GCT REL


---------------------CURRENT JUDGMENT/WARRANT NO: 030 ----------------------

```
COURT OF JURISDICTION...........: ARKANSAS, EASTERN DISTRICT
DOCKET NUMBER...................: 4:17-CR-00111-JM-9
JUDGE...........................: MOODY
DATE SENTENCED/PROBATION IMPOSED: 09-05-2018
DATE COMMITTED..................: 11-21-2018
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO
```

```
                 FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.: $100.00         $00.00          $00.00       $00.00
```

RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO       AMOUNT:  $00.00

------------------------CURRENT OBLIGATION NO: 010 -------------------------
OFFENSE CODE....:  391     21:846 SEC 841-851 ATTEMPT
OFF/CHG: 21:846; AND 841(A)(1) AND (B)(1)(B) CONSPIRACY TO POSSESS WITH
         INTENT TO DISTRIBUTE AND TO DISTRIBUTE HEROIN.

```
 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:  188 MONTHS
 TERM OF SUPERVISION............:    5 YEARS
 NEW SENTENCE IMPOSED...........:  160 MONTHS
 BASIS FOR CHANGE...............: COURT ORDER MODIFYING SENTENCE
 DATE OF OFFENSE................: 05-31-2017
```




G0002       MORE PAGES TO FOLLOW . . .

```
 FOM48  540*23 *          SENTENCE MONITORING        *      09-01-2021
PAGE 002          *        COMPUTATION DATA          *      12:30:38
                            AS OF 09-01-2021
```

REGNO..: 22777-009 NAME: CUMMINS, JABARI ZAKI


------------------------CURRENT COMPUTATION NO: 030 ------------------------

COMPUTATION 030 WAS LAST UPDATED ON 11-21-2020 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 12-17-2020 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 030: 030 010

```
DATE COMPUTATION BEGAN..........: 09-05-2018
TOTAL TERM IN EFFECT............:   160 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:    13 YEARS      4 MONTHS
EARLIEST DATE OF OFFENSE........: 05-31-2017

JAIL CREDIT.....................:   FROM DATE      THRU DATE
                                    11-16-2017     09-04-2018

TOTAL PRIOR CREDIT TIME.........: 293
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 720
TOTAL GCT EARNED................: 162
STATUTORY RELEASE DATE PROJECTED: 03-27-2029
ELDERLY OFFENDER TWO THIRDS DATE: 10-06-2026
EXPIRATION FULL TERM DATE.......: 03-17-2031
TIME SERVED.....................:     3 YEARS      9 MONTHS     17 DAYS
PERCENTAGE OF FULL TERM SERVED..: 28.4
PERCENT OF STATUTORY TERM SERVED: 33.3


PROJECTED SATISFACTION DATE.....: 03-27-2029
PROJECTED SATISFACTION METHOD...: GCT REL
```

REMARKS.......: 04-22-2020 UPDATED PURSUANT TO FSA/EAR; 11-21-20 REC'D REDUCT
                 ORDER REDUCING SENT FROM 188 MONTH TO 160 MONTHS C/SKG:


G0002       MORE PAGES TO FOLLOW . . .

# Certificate of Completion

**Presented to**

**Jabari Cummins**

**For successfully completing the**

**Drug Abuse Education Course**

**The Drug Abuse Education Course is a minimum of 12 hours.   The goal of this program is to help the offender to make an accurate evaluation of the consequences of his/her alcohol/drug use and consider the need for treatment.**

**8/20/2021**

**Date**

_____

**Drug Abuse Treatment Specialist**

**FCC Forrest City**

FI - 129 u

# FCC POLLOCK RECREATION DEPARTMENT

## CERTIFICATE

### OF COMPLETION CHOLESTEROL SELF-STUDY CLASS

THIS CERTIFICATE IS AWARDED TO

*J. Cummins #22777-009*





Recreational Specialist, A. Smith

Date: 10-23-2020

# FCC POLLOCK RECREATION DEPARTMENT

## CERTIFICATE

### OF COMPLETION
### HEALTH AND WELLNESS
### THROUGHOUT THE LIFESPAN
### SELF-STUDY CLASS

CUMMINS, JABARI REG.#22777-009

Date: 09-18-2020

_J. Turner_

Sports Specialist, J. Turner



## U.S. Department of Justice

### Federal Bureau of Prisons

*Federal Correctional Institution*
*Forrest City, AR 72335*

September 1, 2021

MEMORANDUM FOR   To whom it may concern

FROM:                        T. Holst, Correctional Counselor

SUBJECT:                    Inmate Cummins, Jabari #22777-009

I am writing this letter on behalf of inmate Cummins, Jabari #22777-009, regarding the time that I have been in contact with Mr. Cummins in the capacity as one of his work supervisors. I have been familiar with Mr. Cummins for approximately 1 year at FCC Forrest City, at the Bureau of Prisons. Mr. Cummins has an outstanding work ethic, and is an example to other inmates on the work detail that he is assigned to as to how an individual should carry themselves in a prison setting on a work detail. He always reports to work making sure he completes his assigned tasks correctly, and efficiently. I would like to now speak of Mr. Cummins character, and what I have witnessed of him in this area. Mr. Cummins is a very respectable person to authority figures, and to his peers. He strives to be an example to other inmates that he has contact with. I say this to have the reader understand that I believe that Mr. Cummins, if given the chance to re-enter society would not regress back to his behavior that got him incarcerated. I believe that Mr. Cummins would be a productive citizen, who if given the opportunity would do his very best to remain an active part of his community, and remain an individual dedicated to making the remaining days of his life better for him, and those around him.

To whom it may concern,                                        July 19, 2021

I am writing this letter to express my support for Mr. Jabari Cummins in his efforts to
have Act 3582 considered on his behalf.  My name is Mark Green, and I have known
Mr. Cummins since we were kids.  Mr. Cummins acknowledges his mistakes, and he is
remorseful for his past crimes, he has begun serving his sentence, and has expressed
how he is taking advantage of personal development opportunities offered to him.

Mr. Cummins has a great support system in place.  He has a secure home, supportive
family, he has expressed his willingness to obtaining trades while incarcerated that will
help him gain employment upon release.  Mr. Cummins has had many years to reflect
on his past mistakes and is remorseful for his past actions.


Mr. Cummins has an incredibly supportive and loving family, his family needs to be
restored by allowing him to work and provide financial support to his family, to be
actively engaged and physically present to support and interact with his family.
Please have sympathy and compassion when considering Mr. Cummins for Act 3582
(Reduction).


Sincerely,

Mark Green

To: Judge James M. Moody

500 West Capitol Avenue RM(4A)

Little Rock, Arkansas 72201

Dear Judge Moody:

Please be advised this correspondence is a support letter on behalf of a federal inmate incarcerated at FCI Forrest City Med Ark.   Jabari Zaki Cummins. Mr. Cummins currently has a scheduled release date of March 27,2029. I am aware this release date is not anytime soon. Due to Mr. Cummins having pre-existing medical conditions I would like to request a file review on his behalf for consideration of an early release if he is eligible in accordance to the Care Act, Second Chance Act or First Step Act for early release.

Mr. Cumming and I A. Stewart grew up in the same community/neighborhood and have known each other most of our lives. Mr. Cummins is a husband and father of two male African American sons ages seven and fifteen who need their father. Mr. Cummins father was estranged and not present doing his child or adulthood. Mr. Cummins desire is to break the systemic generational curse, which still exist in our community and other African American communities/neighborhoods leaving children raising themselves with no parental guidance's or supervision. This is Mr. Cummins life story growing up with no paternal guidance or supervision and learning survival skills from the streets leading him down a path of trouble with the criminal justice system.

Mr. Cummins is very remorseful for his criminal behavior and bad choices accepting full responsibility for his actions. Mr. Cummins deserve a second chance to become a productive member of society, husband and to be the father he never had in life. Mr. Cummins has the knowledge though his unfortunate circumstances with the criminal justice system to help prevent his sons and other young males from becoming a statistic and part of the same school to prison pipeline he encountered.

If Mr. Cummins is eligible for early release, he has a massive amount of support from family/friends to assist with transitioning and retry back into the community as well as society. Mr. Cummins would have gainful employment immediately upon release at Thaspin Transport, LLC in the maintenance department and the company will fully comply with all employment conditions related to his release of parole. It is my prayer and hope the information provided in this letter is taking into consideration on Mr. Cummins behalf for early release. If you have any question, please feel free to contact me via phone (501) 247-6499 or email
. I appreciate your consideration in advance. Thank you.

Respectfully,

A. Stewart (Thaspin Transporation, LLC)

**Collins & Associates**

**1200 Commerce Street**

**#913**

**Little Rock, Arkansas 72202**

**(501) 486-6344**

Honorable James M. Moody, Jr.

500 W. Capitol Ave

# C 446

Little Rock, Arkansas 72201

March 7, 2021

Dear Judge Moody,

This Letter of Support is being written on behalf of **Jabari Cummins F.C.I** Forrest City, At.

It has been my pleasure to have personally known Jabari Cummins's since his birth. Both his parents the Late Acie Cummins, Sr, and Betsey Watson Cummins are classmates of mine, and Betsey is one of my closes friends and former neighbors for over 60 years.

With that said, with my 30 plus years of experience in Community Development, designing and administrating programs targeting At-Risk-youth and adults residing in Southeast Pulaski County, Arkansas, Jabari and I met to discuss a number of programmatic initiatives he felt were doable.

During our discussion, I immediately recognized that Jabari processed a brilliant mind as well as a very caring heart. After his last incarceration he realized that there were many men transitioning back into society without the proper skills and foundation to make a successful transition, which only leads to re-incarceration. Jabari was strong on the idea on providing a vehicle that would allow a smoother, more successful reentry into society. This motivation provided the initiative for *"Just Right, Inc./".* This transitional living center model for men reentering society after incarceration was born. Just Right Inc. is designed to provide housing for up to 18 month, in-house training, as well as several in-house employment opportunities for its residents to learn, build personal income as well as assist in providing funds for the organization to flourish.

With my assistance Just Right, Inc. received its Arkansas Charter and Articles of Incorporation from the Secretary of State of Arkansas as well as its 501c3 nonprofit recognition from the Internal Revenue Service. Unfortunately, Judge Moody, this is as far as we were able to get due to Jabari's most recent incarceration.

Your Honor, in all honesty I sincerely believe that Jabari has thoroughly learned his lesson and is sincerely ready to put his pass life and deeds behind him and start life anew. Jabari is blessed to have a strong wife, son and an array of other family and extended family support system ready to assist him in his success once he is released. Jabari has expressed to me his eagerness to ensure that Just Right, Inc. Transitional Living Program for men exiting the prison system come to fruition, and I have assured him as I reiterate to you, that I will do everything within my professional abilities and love to see that this most valuable and needed initiative succeed. Therefore, I strong urge us to please look favorably on releasing Jabari Cummins back into mainstream society.

Respectfully Submitted

Rick Collins,

President/CEO

Collins & Associates

Community Development Consultants

Cc: Jabari Cummins

Mrs. Betsy Watson Cummins
49 Baltmore St.
L.R.AR 72206

Reference: Jabari Zaki Cummins
To: Honorable Judge Moody
Federal Court Building

Presenting this letter to an authority has become an honor and a <u>Challenge</u>. Meeting a deadline in the lives of my family members brings many vivid pictures of the road to travel. It has become a privilege to be able to write this support letter on my son's behalf as a parent. I am Mrs. Betsy J. Watson Cummins, the single parent of Jabari Cummins. It's a challenge that the letter of support passes and meets the demand for a release. All positive behavior has been shown along with discipline since Jabari has been away. That's a strong initiative become a free son as well as a husband, and father and nephew.

I do have confidence that upon decision being made of becoming a free and productive citizen to another society is my objective. In the past there has been programs that my son has developed, managed and successfully obtained the privilege to give to another individual while away.

Once again and finally, I am the parent of Zaki Cummins. I am one with complete confidence and prayed upwards to my son's completion of sentencing that has been given. I have accepted the responsible of monitoring where needed and available for any disciplinary and corrections needed for tolerance is a large step for some individual but not for Jabari. Uplift him were his desire for a better life with family and friends is acceptable factor. Also, the Smart Citizen's Act Meme Harper is en route for Jabari's behalf.

Respectfully Yours,

*Betsy J Cummins*

Betsy J Cummins

Dear James Moody

I am writing this letter on behalf of my husband which name is Jabari Zaki Cummins. In regarding this letter I'm asking for and early release due to second chances at life and compassion release. Since my husband has been incarcerated I have suffer from bipolar and anxiety, depression to losing my husband to the systems and my only sister which is deceased now. My life haven't been easy trying to raise my son without a father figure in his life. I try so hard to maintain my daily lives around positive activities to keep sane. Now that my husband has been incarcerated he has taking so many classes and have taken full responsibility of his actions. If he is release he will resign at 5106 b. B. Circle with me and my son. All I'm asking is could you please give him a second chance at life forgive my husband of his actions and think about his kids that's been affected by this. I appreciate your consideration thank you!



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*
*Forrest City, AR 72335*

December 1, 2021

MEMORANDUM FOR   TO WHOM IT MAY CONCERN

FROM:              Jimmy Wilder, Complex Supervisor of Recreation

SUBJECT:          **Jabari Cummins, #22777-009**

This memorandum referral is being respectfully submitted on behalf of Jabari Cummins, #22777-009. Mr. Cummins has been actively involved in various recreation programs and activities since his arrival at FCC Forrest City. Mr. Cummins has been and continues to be an active participant in instructional-based programs within the department and has assisted the department and recreation staff with various program assignments as an inmate recreation aide in the areas of leisure and organized sports that aided in providing quality recreation programs for the inmate population. Mr. Cummins has continued to maintain a positive attitude with the inmate population and departmental staff. Mr. Cummins demonstrates a positive and excellent work ethic in his assigned duties as an inmate recreation aide along with performing his assigned duties efficiently on a daily basis.

Mr. Cummins contribution to the Recreation Department's programs has been a vital asset in allowing the department meet it's goals and overall mission on daily basis and your consideration in this matter will be greatly appreciated.

Sincerely,

Jimmy Wilder, Complex Supervisor of Recreation
FCC Forrest City Complex Recreation Department